Filed 11/25/14  P. v. Garcia-Vega CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E057831 |
| v. | (Super.Ct.No. BAF1100383) |
| ERNESTO GARCIA-VEGA et al., | O P I N I O N |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Bernard Schwartz, Judge. Affirmed with directions.

David M. McKinney, under appointment by the Court of Appeal, for Defendant and Appellant Ernesto Garcia-Vega.

Kimberly J. Grove, under appointment by the Court of Appeal, for Defendant and Appellant Maria Manuelita Ayon.

1

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Charles C. Ragland and Scott C. Taylor, Deputy Attorneys General, for Plaintiff and Respondent.

## I. INTRODUCTION

Defendants and appellants Ernesto Garcia-Vega and Maria Manuelita Ayon were tried before the same jury and convicted of the first degree murder of Ayon's husband, Pedro Vazquez, and conspiracy to murder Vazquez. (Pen. Code, §§ 187, subd. (a), 182, subd. (a)(1).)[1] Ayon claimed she shot and killed Vazquez in self-defense; that Vega was unaware of the problems she was having with Vazquez; and she and Vega did not conspire to murder Vazquez. Vega was prosecuted as an aider and abettor to the murder.

Against each defendant, the jury found true a special circumstance allegation that the murder was committed by lying in wait. (§ 190.2, subd. (a)(15).) The jury also found Ayon personally discharged a firearm in the murder (§ 12022.53, subd. (d)) and Vega participated in the murder knowing a principal was armed (§ 12022, subd. (a)(1)). Each defendant was sentenced to life in prison without the possibility of parole for the murder.

Defendants appeal, and join each other's claims. They claim (1) a prosecution rebuttal witness, Sergeant Brian Reno, was unqualified to render an expert opinion on the location of the gun when it was fired; (2) insufficient evidence supports the lying-in-wait special-circumstance findings; (3) the jury was improperly instructed on the lying-in-wait special-circumstance allegation as it applied to Vega; (4) the court had a duty to give

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

CALCRIM No. 702 sua sponte, on the lying-in-wait special-circumstance allegations; (5) the court had a duty to give CALCRIM No. 522 and CALJIC Nos. 8.20, 8.30, and 8.71 sua sponte, on the murder charges; and (6) parole revocation restitution fines were improperly imposed and must be stricken.

We agree the parole revocation restitution fines must be stricken, because the fines are reflected in the sentencing minute orders and abstracts of judgment, though in orally pronouncing the sentences the court said it was not imposing the fines. We reject defendants' other claims and affirm the judgment in all other respects.

## II. FACTUAL BACKGROUND

A. *Prosecution Evidence*

In May 2011, 31-year-old Ayon married 49-year-old Pedro Vazquez. Ayon and Vazquez had a "[v]ery turbulent" relationship and did not live together after they married. After marrying Vazquez, Ayon was spending time with Vega, who, like Ayon, was in his early 30's. Vazquez worked as an electrician, and if he died Ayon was to receive a $60,000 one-time payment and monthly payments of $500.90 from his pension plan.

Ayon shot and killed Vazquez in his Honda Ridgeline truck, around 11:30 p.m. on Saturday, July 9, 2011, while the Honda was parked in a remote area on San Timoteo Canyon Road, and Vazquez was sitting in the driver's seat. Around 2:00 p.m. on July 9, Vazquez told his adult daughter Tanya he was having dinner with Ayon that night, and they were going to discuss "fixing things" in their relationship. Vazquez then went to pick up Ayon, driving his Honda Ridgeline truck.

3

On Friday, July 8, 2011, Ayon and Vega went to a party together at the apartment of Sebero Ortiz in Paramount. Israel Mariscal and Ortiz lived in the same apartment complex. Mariscal was charged, together with Ayon and Vega, in the same felony complaint with murder and conspiracy to murder Vazquez, but the charges against Mariscal were dismissed after he testified at the preliminary hearing and the court found insufficient evidence to support the charges against him. Both Mariscal and Ortiz testified against Ayon and Vega at trial. The most damaging testimony was from Mariscal.

Mariscal testified he and Vega had known each other since childhood, but they were not close friends. Around 5:00 p.m. on July 9, Vega called Mariscal and asked him whether he and Ortiz would pick up Vega's truck in Downey, where Ayon lived, and park it at their apartment complex in Paramount. Mariscal, Ortiz, and Ortiz's son met Vega in Downey, obtained his truck, and drove it to their apartment complex. When he met Ortiz and Mariscal in Downey, Vega was driving Ayon's white Nissan Maxima.

Around 9:00 p.m. on July 9, Vega drove to Mariscal's apartment in the Nissan, and asked Mariscal to come with him to pick up "a girl" nearby. Mariscal was not expecting Vega, but agreed to go with him. Mariscal did not believe they would be gone long, so he left his apartment without taking his wallet or any identification with him. Mariscal did not know and did not ask Vega what "girl" they were going to pick up.

Vega said they were picking up the girl at a casino but he needed to ask her which one, so he called her on his cell phone. Vega appeared to be "a little nervous" as he and

4

Mariscal were driving on Interstate 105 toward Interstate 60. While talking on his cell phone on Interstate 60, Vega saw a highway patrolman, handed his cell phone to Mariscal, and Mariscal heard a woman say: "Dear, I'm on the Azusa Street at the doughnut shop." Vega drove to the donut shop, where Mariscal saw a Honda Ridgeline truck. Vega said "the girl" was in the Honda and would be coming with them later, and made another call.

Vega and Mariscal followed the Honda from the donut shop to a gas station, where Ayon got out of the driver's side of the car. Ayon and Vega went into the gas station store and came out several minutes later. Mariscal could not see whether anyone was in the Honda with Ayon. Vega and Mariscal followed Ayon, who was still driving the Honda, back onto Interstate 60. Vega made another call and said Ayon would be coming with them after she dropped off her husband at a casino. Mariscal was becoming concerned about the length of the trip they were taking and where they were going, but Vega told him not to worry. Vega and Mariscal exited Interstate 60 near Moreno Valley, and followed the Honda into a dark, secluded mountainous area. According to Mariscal, the Honda did not stop from the time it left the gas station to this point.

The Honda stopped in a remote area on San Timoteo Canyon Road. Vega pulled to the side of the road, ahead of the Honda, but kept the engine of the Nissan running. Mariscal could not hear or see what was going on in the Honda behind them because Vega was playing music and the headlights of the Honda were shining into the side mirror of the Nissan.

5

After five or six minutes, Ayon "came over running" to the Nissan, holding a bag and appearing "scared." She got into the rear passenger seat, told Vega to "[g]o," and Vega "took off." As they were driving away, Vega asked Ayon why she took so long, and Ayon said she was erasing all the fingerprints from the steering wheel. Vega then asked, "And the gun?," and Ayon said, "I have it here." Ayon asked Mariscal for water, he said he did not have any water but handed her his Gatorade bottle, and she washed her hands with the Gatorade.

A vehicle was following them, and Vega asked Ayon how he could prevent the person in the vehicle from seeing them. Ayon said, "Go. Go," and Vega drove faster. Vega then said the police were following them, and Ayon told him to drive faster. After Vega drove through a stop sign, he said they would be shot if he continued, so he pulled over and stopped. At that point, Ayon said, "Don't worry, Dear. I already threw it away," and told Vega and Mariscal to tell the police they were going to the casino.

Corporal Saban Hardesty of the Beaumont Police Department stopped the Nissan while driving an unmarked police vehicle equipped with police lights and sirens. He and Officer Michael Granada were conducting surveillance in the area, in separate, unmarked vehicles, due to recent copper wire thefts. Around 11:30 p.m., Corporal Hardesty noticed two sets of headlights, drove closer, and saw the Honda on the side of the road, 10 to 15 yards behind the Nissan. The dome light of the Honda was on, and Ayon was standing outside the front passenger door of the Honda, facing into the cab. As he drove closer,

6

Officer Hardesty saw Ayon shut the door of the Honda, walk quickly to the Nissan, and get into its rear passenger seat. The Nissan then "drove away pretty quickly."

As Corporal Hardesty pulled up next to the Honda, he saw Vazquez slumped over in the driver's seat. He activated his police lights and "went after" the Nissan, which at that point was 150 yards ahead of him, and notified the dispatcher he was making a traffic stop. The Nissan "seemed to slow down just slightly," but as he came within 15 to 20 feet of it, "it sped up and ran through [a] stop sign." He activated his police siren, notified dispatch he had a "failure to yield," asked for additional officers, and asked that another officer check on the Honda. The Nissan pulled to the side of the road.

After hearing Corporal Hardesty's dispatch, Officer Granada drove to the Honda and found Vazquez slumped over in the driver's seat, bleeding from his face and head. When Officer Granada opened the left rear passenger door of the Honda, he noticed "clouds of smoke" and "a very strong odor of gunpowder." There appeared to be gunpowder residue and holes in the back of Vazquez's shirt and blood on the back of the driver's seat.

Corporal Hardesty detained Ayon, Vega, and Mariscal at gunpoint, after hearing on the radio that a person in the Honda had apparently been shot. As they were being transported to the police station, Vega asked Ayon how many times she shot Vazquez, and Ayon said, "[a]bout five." Mariscal asked Vega what problems he had gotten him into, and Vega asked Mariscal to forgive him. Gunshot residue was found on Ayon's hands but not on Vega's or Mariscal's hands.

7

Vazquez died of multiple gunshot wounds. He had a total of nine gunshot wounds, including three from bullets that entered the back, right area of his head and three that entered the back of his right shoulder. Any one of the gunshot wounds to the head would have been fatal. Soot and stippling around all of the gunshot wounds indicated the shots were fired from a distance of 6 to 24 inches. The bullets that entered the head and shoulder traveled from back to front and from right to left. Based on the wounds and the paths of the bullets through Vazquez's body, the forensic pathologist who conducted the autopsy, Dr. Joanna Young, opined Vazquez was "[m]ost likely" shot from behind and to his right.

Nine shell casings and six projectiles, including two bullet fragments, all fired from a Taurus nine-millimeter semiautomatic handgun, were found inside the Honda. The gun was found at the base of a hill, near where the Nissan ran the stop sign, with an empty 12-round magazine and one live round in its chamber.

Investigator Joshua Button of the Riverside County Sheriff's Department, Central Homicide Unit, explained that when a semiautomatic handgun is fired, the casings holding the bullets are ejected upward and to the right. Six bullets or bullet fragments were found in the front area of the Honda. Eight of the nine casings were also found in the front area of the Honda, including in the front passenger seat, the front passenger footwell, the driver's footwell, the center console, and the driver's door. One casing was in the rear passenger seat. Investigator Button testified the location of the casings was consistent with the gun being fired from the *rear* passenger side of the Honda, toward the

8

driver's seat area. On cross-examination, Investigator Button indicated the locations of the casings were also consistent with the gun being fired from the *front* passenger side.

In the backseat of the Nissan, Investigator Button found three cell phones belonging to Ayon, a cell phone SIM card, Ayon's purse, and a wallet. Inside Ayon's purse, Investigator Button found a pair of latex gloves and a $300 check from Vazquez to Ayon. Inside the wallet was Vazquez's gas card and a yellow piece of paper with a note apparently written by Vazquez to Ayon attempting to reach an agreement about their relationship.

Cell phone records indicated Ayon had gone to the murder location two days earlier, because her cell phone calls pinged off a nearby cell tower. Cell phone records also indicated Ayon and Vega were often in communication during the days preceding the murder, and on the night of the murder. During the previous month, Ayon opened two prepaid cell phone accounts for herself and Vega, and during the week before the murder, 90 percent of the calls made on the prepaid cell phones were made between the two phones.

In Ayon's cell phone, Vega's contact name was "A. Mariza," which meant "great love" when read as one word in Spanish. In Vega's cell phone, Ayon's contact name was "Mis Ojaso," which literally meant "my eyes" and could mean "Ms. Good-looking" in Spanish.

A text message sent from Vazquez to another one of Ayon's cell phones read: "Could you bring my gas card, I call you but you turned off your number, don't worry I

9

wish that you are happy with him, I will keep on my path only as of today, you will always be a lying woman, God bless you."

B. *Defense Evidence*

    1. Ayon's Defense

Ayon testified and claimed she shot Vazquez in self-defense, after he took the gun from the waistband of his pants and pointed it at her in the Honda.

Ayon testified she met and began dating Vazquez around 18 months before she married him in May 2011, and she married him because she loved him. Their relationship changed after they married; Vazquez was "very jealous," was always checking her cell phone, and "had another woman." On July 9, Ayon met Vazquez at her apartment, they talked for a while, and then left in the Honda to go to the casino.

After they left the gas station, Ayon was driving, but Vazquez wanted to drive so they stopped and switched seats around 20 minutes before they reached San Timoteo Canyon Road. Vazquez knew they were being followed because he was standing next to Ayon when she "called for them to come get [her]," and he was angry about it. He was telling Ayon she was going to do what he said, and Ayon did not want to argue with him.

While they were driving on San Timoteo Canyon Road, Ayon told Vazquez to stop the Honda because she was going to get out and "go back with a young man." Vazquez told Ayon she "didn't know how he was when he was angry," then he pulled a pistol from his belt and pointed it at her stomach. She took the pistol from Vazquez, shot

10

him because she feared for her life, and kept shooting because she did not know how to stop.

Ayon then ran to the Nissan, told Vega and Mariscal they should go, and threw the gun out of the window without telling the men she had a gun and had just shot Vazquez. She asked Mariscal for water, he handed her his Gatorade, and she drank it but did not wash her hands with it. She had never seen Mariscal before. Minutes later, the police came.

A videotape recording of Ayon's July 10 interview with Investigator Nelson Gomez, a detective with the Riverside County Sheriff's Department, Central Homicide Unit, was played for the jury. During the interview, Ayon denied being in the Honda on the night of July 9, denied shooting Vazquez, and kept saying she "didn't see anything" before Corporal Hardesty stopped her, Vega, and Mariscal in the Nissan. Ayon admitted she lied during the July 10 interview and lied again during a second interview two days later, and claimed she lied both times because she was afraid to tell the truth. Ayon knew Vazquez had a pension plan and that she would receive monthly payments of $580 from his pension plan if he died.

Ayon considered Vega to be her "good friend," but denied they had a romantic relationship. She never told Vega what was happening between herself and Vazquez. Earlier on July 9, she called Vega and asked him to pick her up that night at the donut shop. He said his pickup truck would not go that far, so she suggested he take her car.

11

A witness who spoke Spanish and English testified that "A. Mariza" was a name that had no meaning in Spanish or English. Ayon disguised Vega's name with the "Mariza" name on her cell phone because Vazquez would be jealous if he saw Vega's name. On July 7, two days before the shooting, Ayon claimed she was on her way to Mexicali for a doctor's appointment and stopped somewhere along Interstate 60 to get gas.

2. Vega's Defense

Vega did not testify. His defense was that he did not know Ayon was going to shoot and kill Vazquez, and he attempted to discredit Mariscal's trial testimony as given to curry favor with the district attorney's office and procure the dismissal of the charges against him. Vega presented evidence that, in December 2011, before the charges against him were dismissed following the March 2012 preliminary hearing, Mariscal signed an agreement with the district attorney's office agreeing to be interviewed. The agreement required him to tell the truth and provided that nothing he said would be used against him *unless* he later testified inconsistently with his interview statements.

Detective Julie Bryant, a senior investigator for the district attorney's office, interviewed Mariscal in December 2011, pursuant to the agreement. During that interview, Mariscal's attorney said to Mariscal: "[C]ontradict me . . . if I'm misinterpreting you . . . but we want to help [the People's] case against the two people that did this very bad thing, okay."

Vega emphasized that Mariscal's trial testimony and December 2011 interview statements differed in important respects from statements he gave, and did not give, when he was first interviewed on July 10, 2011, shortly after the shooting. Vega pointed out that during the July 10 interview (1) Mariscal did not say that either Vega or Ayon said anything about a gun, including throwing a gun away, after Ayon got into the Nissan; (2) Mariscal said Vega could not have been involved in the shooting; and (3) Mariscal did not say anything about Vega asking Ayon why she took so long, did not say Ayon said she was erasing her fingerprints from the Honda steering wheel, did not say Vega asked Ayon how many times she shot Vazquez, or that Ayon responded "about five," and did not say Vega asked Marsical to "forgive [him]" for getting him into trouble after they were arrested.

C. *Prosecution Rebuttal Evidence*

When sheriff's investigators interviewed Ayon, she claimed she knew nothing about Vazquez's death and was not riding in the Honda that evening. Instead, she claimed she was in her Nissan with Vega and Mariscal, and they became lost on their way to the casino. She did not know Vazquez was on the same road, and denied shooting him. During her first interview, she denied having a romantic relationship with Vega, but in a second interview she admitted she "liked" Vega and said: "That doesn't look good for me."

Sergeant Brian Reno of the Riverside County Sheriff's Department, Central Homicide Unit, examined the bullet strikes in the front area of the Honda. Based on the

13

location of the bullet strikes and his training and experience, Sergeant Reno opined that the bullets were fired from behind and to the right of the driver's seat.

## III. DISCUSSION

A. *Sergeant Reno Was Qualified to Testify the Gun Was Fired from Behind and to the Right of the Driver's Seat*

Ayon, joined by Vega, claims Sergeant Reno was unqualified to render an expert opinion that Vazquez was shot from behind and to the right of the driver's seat, in rebuttal to Ayon's testimony that she shot Vazquez from the front passenger seat in self-defense after he placed a gun to her stomach. (Evid. Code, § 720, subd. (a).) We conclude the sergeant was qualified to render the opinion, and any error in admitting his expert opinion testimony was not prejudicial.

"A person is qualified to testify as an expert if he [or she] has special knowledge, skill, experience, training, or education sufficient to qualify him [or her] as an expert on the subject to which his [or her] testimony relates. Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert." (Evid. Code, § 720, subd. (a).) The witness's qualifications "may be shown by any otherwise admissible evidence, including his [or her] own testimony." (Evid. Code, § 720, subd. (b); *People v. Fuiava* (2012) 53 Cal.4th 622, 672.)

An expert's qualifications must be related to the particular subject upon which he or she is giving expert testimony, and the expert's qualifications on related but distinct

14

subjects are insufficient.  (*People v. Hogan* (1982) 31 Cal.3d 815, 852, overruled on other grounds in *People v. Cooper* (1991) 53 Cal.3d 771, 836.)  "'"We are required to uphold the trial judge's ruling on the question of an expert's qualifications absent an abuse of discretion.  [Citation.]  Such abuse of discretion will be found only where '"the evidence shows that a witness *clearly lacks* qualification as an expert . . . ."'  [Citation.]'" [Citation.]"  (*People v. Pearson* (2013) 56 Cal.4th 393, 445.)

Sergeant Reno was sufficiently qualified to opine that the gun that made the three bullet strikes in the driver's door was fired from behind and to the right of the driver's seat where Vazquez was sitting when he was shot.  The sergeant had been investigating homicides for eight years as a detective and later as a sergeant for the Central Homicide Unit of the Riverside County Sheriff's Department.  He supervised other homicide detectives and forensic technicians; he was trained to look for evidence of bullet strikes on hard surfaces; and he had previously testified in court regarding the nature of bullet strikes in vehicles, buildings, and on other hard surfaces.  Ten to 15 times during his career, he had used "trajectory rods" to track the direction of bullet strikes "in a vehicle."

In explaining the bases of his opinion, Sergeant Reno pointed out that "bio matter" deposited on the windshield and driver's side window of the Honda after Vazquez was shot, "clearly" showed the bullets were not fired from a 90-degree angle to the driver's door or from the front passenger seat, but from an "acute" angle of approximately 30 degrees to the driver's door and from behind and to the right of the driver's seat.  He agreed his conclusions were consistent with the testimony of Dr. Young, the forensic

15

pathologist who performed Vazquez's autopsy, who opined that Vazquez was "[m]ost likely" shot from behind and to his right, based on the paths of the bullet wounds through his body.[2]

*People v. Hogan, supra,* 31 Cal.3d 815, upon which Ayon relies, is distinguishable because it involved blood spatter evidence, a different type of evidence than bullet strike evidence. In *Hogan*, a criminalist was unqualified to testify that bloodstains on the defendant's pants and shoes were "spatters" caused by blood flying through the air, rather than by "surface-to-surface" contact with a bloody object. (*Id.* at pp. 851-853.) The expert's qualifications "boiled down to having observed many bloodstains," but he had

---

[2] The People claim defendants forfeited their right to challenge the sergeant's expert qualifications because neither defendant objected when the sergeant testified that *the third* of the three bullets strikes on the driver's door came from behind and to the right of the driver's seat. We disagree the claim was forfeited. Ayon objected on foundation grounds when the prosecutor asked Sergeant Reno what the trajectory rods that were placed in *the first of three bullet strikes* showed, and objected on the same grounds when the prosecutor asked where the gun that made the first of the three bullet strikes was fired from. The court sustained the objections, but allowed the prosecutor to lay additional foundation by asking the sergeant about his training and experience in examining bullet strike evidence.

Ayon's "foundation" objections were "so stated as to make clear the specific ground of the objection[s]" (Evid. Code, § 353), namely, that Sergeant Reno was unqualified to render an expert opinion that the gun that made the three bullet strikes in the driver's door was fired from behind and to the right of the driver's seat (*People v. Pearson, supra,* 56 Cal.4th at p. 438 [specificity in objection is required to enable the court to make an informed ruling on the objection and allow the proponent of the evidence to cure the defect]). Any further objection on factual "foundation" or qualification grounds would have been futile, when the sergeant later testified concerning the second and third bullet strikes on the driver's door, and that the gun that made those bullet strikes was also fired from behind and to the right of the driver's seat.

16

never performed any laboratory analyses to determine whether bloodstains were spatters, either in the past or in the present case.  (*Id.* at pp. 852-853.)

Blood spatter evidence is complex, and cannot be equated or conflated with bullet strike evidence, or the general trajectory of a bullet that makes a bullet strike on a hard surface.  As Ayon points out:  "'The competency of an expert is relative to the topic and fields of knowledge about which the person is asked to make a statement.  In considering whether a person qualifies as an expert, the field of expertise must be carefully distinguished and limited.'"  (*People v. Kelly* (1976) 17 Cal.3d 24, 39.)

Though, as Ayon pointed out at trial, Sergeant Reno had not taken any "official classes" to determine the trajectory of bullets that make bullets strikes on hard surfaces, and he was unaware of any studies involving the accuracy of trajectory rods and their use in determining the trajectory of bullets when they strike hard surfaces, the court reasonably concluded his on-the-job training and experience qualified him to opine that the gun that made the three bullet strikes in the driver's side door was fired from behind and to the right of the driver's seat.  Indeed, his qualifications were not *clearly lacking* (*People v. Pearson, supra,* 56 Cal.4th at p. 445), and any limitations on his qualifications went to the weight of his opinions, not their admissibility.

Further, any error in admitting Sergeant Reno's expert testimony was harmless. "The erroneous admission of expert testimony only warrants reversal if 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.'"  (*People v. Prieto* (2003) 30 Cal.4th 226, 247, quoting *People*

17

*v. Watson* (1956) 46 Cal.2d 818, 836.) There is no reasonable probability either Ayon or Vega would have realized a more favorable result had Sergeant Reno's testimony not been admitted. Dr. Young testified Vazquez was "[m]ost likely" shot from behind and to his right, based on the paths the bullets traveled through his body. Investigator Button likewise opined, based on the location of the shell casings in the Honda, that the shooter fired from the Honda's rear passenger side. Further, the location of the "bio matter" on the windshield and on the driver's side window clearly indicated Vazquez was shot from behind the driver's seat and to his right, and not from a 90-degree angle to the driver's door or from the front passenger seat, as Ayon's self-defense testimony indicated.

B. *Substantial Evidence Supports the Lying-in-wait Special-circumstance Findings*

Vega, joined by Ayon without additional argument, claims insufficient evidence supports the lying-in-wait special-circumstance finding against him. We conclude substantial evidence supports the lying-in-wait special-circumstance findings against each defendant.

A punishment of life in prison without parole may be imposed on a defendant if the jury finds that "[t]he defendant intentionally killed the victim by means of lying in wait." (§ 190.2, subd. (a)(15).) The jury was instructed pursuant to CALCRIM No. 728 that defendants were charged with the special circumstance of murder by means of lying-in-wait, and to prove the special circumstance allegation true, the People had to prove: "1. A defendant intentionally killed Pedro Vazquez; [¶] AND [¶] 2. A defendant committed the murder by means of lying in wait. A person commits a murder by means

18

of lying in wait if:  [¶]  1.  He or she concealed his or her purpose from the person killed;  [¶]  2.  He or she waited and watched for an opportunity to act;  [¶]  3.  Then he or she made a surprise attack on the person killed from a position of advantage;  [¶]  AND  [¶]  4.  He or she intended to kill the person by taking the person by surprise.  [¶]  The lying in wait does not need to continue for any particular period of time, but its duration must be substantial and must show a state of mind equivalent to deliberation and premeditation.

"The defendant acted deliberately if he or she carefully weighed the considerations for and against his or her choice and, knowing the consequences, decided to kill.  The defendant acted with premeditation if he or she decided to kill before committing the act that caused death.  [¶]  A person can conceal his or her purpose even if the person killed is aware of the other person's physical presence.  [¶]  The concealment can be accomplished by ambush or some other secret plan."

The standard of review is settled.  In reviewing a claim that insufficient evidence supports a special circumstance finding, we apply the same standard of review we apply in reviewing a challenge to the sufficiency of the evidence supporting a conviction.  (*People v. Valencia* (2008) 43 Cal.4th 268, 289-290.)  That is, we review the entire record in the light most favorable to the prosecution to determine whether it contains substantial evidence—evidence that is reasonable, credible, and of solid value—from which a rational trier of fact could find the essential elements of the allegation true beyond a reasonable doubt.  (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

19

Vega argues insufficient evidence supports the jury's finding that Ayon concealed from Vazquez her purpose or intent to kill Vazquez. Vega argues, "we do not know what took place immediately before the fatal attack" on Vazquez, and "there is no evidence . . . Vazquez was unaware that Ayon was going to kill him." Not so.

The elements of lying in wait may be inferred from the circumstances surrounding the killing. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1172-1173.) And here, the evidence supports a reasonable inference that Ayon shot and killed Vazquez by firing the gun from the rear passenger seat of the Honda, while Vazquez was looking the other way and was unaware of her intent to kill him.

Indeed, Mariscal testified that Ayon was driving the Honda after she left the gas station, but he did not see the Honda stop again before it stopped on San Timoteo Canyon Road. When the Nissan pulled in front of the Honda, Mariscal could not see what was going on behind him in the Honda because its headlights were shining into his side mirror. Still, the evidence supports a reasonable inference that Ayon stopped the Honda on San Timoteo Canyon Road; Vazquez got into the driver's seat; and Ayon shot and killed Vazquez from the rear passenger seat. Investigator Button testified the shots were fired from the rear passenger seat—based on the location of the casings in the front area of the Honda and because a semiautomatic firearm, such as the Taurus nine-millimeter that was used in the shooting, ejects its shell casings upward and to the right.

20

C. *The Jury Was Properly Instructed on the Lying-in-wait Special-circumstance*

*Allegation as to Vega*

Vega claims the court prejudicially erred in failing to instruct the jury that, because the prosecution was alleging he aided and abetted the murder and did not directly perpetrate it, the jury had to find he intended that Vazquez would be killed in order to find the special circumstance allegation true against him. Ayon joins this claim, but it does not benefit her because she admitted she shot and killed Vazquez in self-defense. Thus, Ayon could not have aided and abetted the murder.

Section 190.2, subdivision (c) allows special circumstance allegations to be made against persons who are not the actual killer, but who, *with the intent to kill*, aid and abet the killing. (*People v. Ybarra* (2008) 166 Cal.App.4th 1069, 1085-1086.) The jury was instructed that it was required to consider the special circumstance allegation "separately for each defendant." (CALCRIM No. 700.) And as noted, the jury was instructed that a person commits a murder by lying in wait if, among other things, "[h]e or she intended to kill the person by taking the person by surprise." (CALCRIM No. 728.)

Vega argues these instructions did not inform the jury that, in order to find the special circumstance allegation true against him, it had to find *he* intended that Vazquez would be killed. He argues the instructions "conveyed the thought" that if the jury found Ayon intended to kill Vazquez, it could find the special circumstance allegation true against him, as well as Ayon. He emphasizes the singular, disjunctive, use of the phrases "a defendant" and "he or she" in CALCRIM No. 728, set forth above.

21

We disagree the instructions allowed the jury to find the special circumstance allegation true against Vega without finding he intended Vazquez would be killed. Indeed, on the murder charge, the jury was given CALCRIM No. 401 on aiding and abetting intended crimes, which told the jury it had to find Vega *knew* Ayon intended to kill Vazquez *and* that Vega intended to aid and abet Ayon in murdering Vasquez in order find Vega guilty of the first degree murder of Vasquez as an aider and abettor. Thus, before the jury considered the special circumstance allegation against Vega, it had to have found he intended Vazquez would be killed and to aid and abet his killing.

Additionally, the jury was instructed pursuant to CALCRIM No. 700 that it had to consider the special circumstance allegation "separately for each defendant." Thus, together, CALCRIM Nos. 700 and 728 told the jury it could not find the special circumstance allegation true against Vega unless it found "he" intended to kill Vazquez by taking him by surprise. In sum, the jury was properly instructed it had to find Vega had to have intended that Vazquez would be killed, in order to find the special circumstance allegation true against Vega.

D. *The Trial Court Had No Duty to Give CALCRIM No. 702 Sua Sponte*

Vega claims the trial court prejudicially erred in failing to give CALCRIM No. 702 (Special Circumstances: Intent Requirement for Accomplice After June 5, 1990— Other Than Felony Murder (Pen. Code, § 190.2(c))) sua sponte.[3] As the Bench Notes to

_____

[3] The pattern instruction, CALCRIM No. 702, states: "If you decide that (the/a) defendant is guilty of first degree murder but was not the actual killer, then, when you consider the special circumstance[s] of _____ <*insert only special*

*[footnote continued on next page]*

22

CALCRIM NO. 702 state: "The court has a **sua sponte** duty to instruct the jury on the mental state required for accomplice liability when a special circumstance is charged and there is sufficient evidence to support the finding that the defendant was not the actual killer. . . ." (Bench Notes to CALCRIM No. 702 (2013) p. 420.) But the Bench Notes further state: "For those special circumstances where intent to kill is required for both the actual killer and the accomplice, *this instruction is not required. For those special circumstances, the instruction on the special circumstance states 'the defendant intended to kill' as an element*." (*Id*. at p. 421, italics added.)

Ostensibly, the italicized portion of the Bench Note to CALCRIM No. 702 refers to CALCRIM No. 728, which instructs that in order to find the lying-in-wait special-circumstance allegation true against a defendant, the jury must find, among other things, that "[*h*]*e or she intended to kill the person* by taking the person by surprise." (Italics

_____

*[footnote continued from previous page]*
*circumstance[s] under Pen. Code, §§ 190.2(a)(2), (3), (4), (5) or (6)>*, you must also decide whether the defendant acted with the intent to kill. [¶] In order to prove (this/these) special circumstance[s] for a defendant who is not the actual killer but who is guilty of first degree murder as (an aider and abettor/ [or] a member of a conspiracy), the People must prove that the defendant acted with the intent to kill. [¶] [The People do not have to prove that the actual killer acted with the intent to kill in order for (this/these) special circumstance[s] to be true. [If you decide that the defendant is guilty of first degree murder, but you cannot agree whether the defendant was the actual killer, then, in order to find (this/these) special circumstance[s] true, you must find that the defendant acted with the intent to kill.]] [¶] If the defendant was not the actual killer, then the People have the burden of proving beyond a reasonable doubt that (he/she) acted with the intent to kill for the special circumstance[s] _____ *<insert only special circumstance[s] under Pen. Code, §§ 190.2(a)(2), (3), (4), (5) or (6)>* to be true. If the People have not met this burden, you must find (this/these) special circumstance[s] (has/have) not been proved true [for that defendant].

23

added.)  As discussed, the jury was given CALCRIM No. 728; thus, the court did not have a duty to give CALCRIM No. 702 sua sponte.  Indeed, and as discussed, CALCRIM Nos. 700 and 728 together instructed the jury that, to find the special circumstance allegation true against Vega, it had to find "he" intended to kill Vazquez.

The same argument Vega raises here was rejected in *People v. Bonilla* (2007) 41 Cal.4th 313, where the court considered CALJIC No. 8.81.5, the predecessor instruction to CALCRIM No. 728, which defined the elements of the lying-in-wait special-circumstance allegation.  As the court explained, CALJIC No. 8.81.5 correctly stated the law by not requiring the jury to find that the defendant, Bonilla, who allegedly aided and abetted the murder, personally killed the victim or personally lay in wait for the victim. (*People v. Bonilla, supra,* at pp. 330-332.)  Instead, the instruction properly allowed the jury to find the allegation true against Bonilla based on evidence that he, *with the intent to kill*, aided and abetted the actual killer, who lay in wait for and killed the victim. (*Ibid.*)  Together, CALCRIM Nos. 700 and 728, given here, required the jury to find that Vega, as an alleged aider and abettor to a murder, did so with intent to kill.

E. *The Jury Was Adequately Instructed on "Provocation-based" Second Degree Murder*

In four separate arguments, defendants claim the court inadequately instructed the jury on "provocation-based" second degree murder.  On first and second degree murder, the court gave CALCRIM Nos. 520 (First or Second Degree Murder with Malice Aforethought) and 521 (First Degree Murder), but did not give CALCRIM No. 522 (Provocation:  Effect on Degree of Murder).  The court instructed on voluntary

24

manslaughter by giving CALCRIM Nos. 570 (Voluntary Manslaughter: Heat of Passion) and 571 (Voluntary Manslaughter: Imperfect Self Defense).

Though neither defendant requested them, Vega argues the trial court had a duty to give CALCRIM No. 522 (Provocation: Effect on Degree of Murder), as well as CALJIC Nos. 8.20 (Deliberate and Premeditated Murder) and 8.30 (Unpremeditated Murder of the Second Degree) sua sponte. Ayon joins these claims, and, joined by Vega, claims the court also had a sua sponte duty to give CALJIC No. 8.71 (Doubt Whether First or Second Degree Murder), which was also not requested. In light of the instructions given, we conclude the court did not have a duty to give CALCRIM No. 522 or CALJIC Nos. 8.20, 8.30, or 8.71, sua sponte.

A trial court has a duty to instruct sua sponte on the general principles of law relevant to the issues raised by the evidence. (*People v. Rogers* (2006) 39 Cal.4th 826, 866 (*Rogers*).) This sua sponte obligation includes instructing on lesser included offenses when substantial evidence shows the defendant may be guilty of the lesser offense but not the greater offense. (*People v. Breverman* (1998) 19 Cal.4th 142, 162 ["a trial court errs if it fails to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence."].)

We independently review the correctness and adequacy of the trial court's instructions, examining whether the court "'fully and fairly instructed on the applicable law.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) We consider the instructions as a whole and presume the jurors are capable of understanding and

25

correlating the instructions. (*Ibid.*) While a trial court has a duty to adequately instruct on the law, it has no duty to give clarifying or amplifying instructions, absent a request. (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1331.) Pinpoint instructions— instructions that relate particular facts to a legal issue in the case—are required to be given on request if there is evidence to support the theory, but are not required to be given sua sponte. (*People v. Saille* (1991) 54 Cal.3d 1103, 1119.)

With these principles in mind, we turn to the four instructions defendants claim the court had a duty to give sua sponte.

1. CALCRIM No. 522

CALCRIM No. 522 provides: "Provocation may reduce a murder from first degree to second degree [and may reduce a murder to manslaughter]. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. [Also, consider the provocation in deciding whether the defendant committed murder or manslaughter.] . . . ."

CALCRIM No. 522 is the successor to CALJIC No. 8.73 (Evidence of Provocation May be Considered in Determining Degree of Murder), which in its latest edition, published in 2005, provided: "If the evidence establishes that there was provocation which played a part in inducing an unlawful killing of a human being, but the provocation was not sufficient to reduce the homicide to manslaughter, you should

consider the provocation for the bearing it may have on whether the defendant killed with or without deliberation and premeditation."

CALJIC No. 8.73 is a pinpoint instruction. (*Rogers, supra,* 39 Cal.4th at pp. 878-879 ["Because CALJIC No. 8.73 relates the evidence of provocation to the specific legal issue of premeditation and deliberation, it is a 'pinpoint instruction' as that term was defined in *People v. Saille, supra,* 54 Cal.3d at pages 1119-1120 . . . ."].) As indicated, "[pinpoint] instructions relate particular facts to a legal issue in the case or 'pinpoint' the crux of a defendant's case . . . . [Citation.] They are required to be given upon request when there is evidence supportive of the theory, but they are not required to be given sua sponte." (*People v. Saille, supra,* 54 Cal.3d at p. 1119 [instruction relating evidence of intoxication premeditation and deliberation does not involve a general principle of law as that term is used in case imposing a sua sponte duty to instruct].)

Based on the reasoning of *Rogers*, CALCRIM No. 522, like CALJIC No. 8.73, is a pinpoint instruction. As the *Rogers* court explained: "[U]nder the principles expressed in CALJIC No. 8.73, provocation is relevant only to the extent it 'bears on the question' whether defendant premeditated and deliberated. [Citation.] Because CALJIC No. 8.73 relates the evidence of provocation to the specific legal issue of premeditation and deliberation, it is a 'pinpoint instruction' . . . and need not be given on the court's own motion." (*Rogers, supra,* 39 Cal.4th at pp. 878-879.)

Like CALCRIM No. 8.73, CALCRIM No. 522 would have instructed that provocation may reduce a murder from first degree to second degree, or to manslaughter,

27

depending on the degree or sufficiency of the provocation. But because CALCRIM No. 522 is a pinpoint instruction, the court did not have a sua sponte duty to give it. (See *Rogers, supra,* 39 Cal.4th at pp. 878-879; *People v. Hernandez, supra,* 183 Cal.App.4th 1327, 133-1334 ["As reflected in *Rogers*, the fact that a trial court is not required to instruct on provocation for second degree murder *at all* supports that it is not misleading to instruct on provocation without explicitly stating that provocation can negate premeditation and deliberation."].)

Further, the mental state required for first and second degree murder was covered by CALCRIM No. 520 (Murder: First and Second Degree), and the mental state required for first degree murder based on premeditation and deliberation, was covered by CALCRIM No. 521. CALCRIM No. 521 instructed, in part: "A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated." Neither Vega nor Ayon asked the court to *additionally* instruct the jury that "subjective" or unreasonable provocation may reduce what would otherwise be a first degree murder to second degree murder, but not manslaughter. And because they failed to request such a pinpoint instruction in the trial court, they have forfeited their claim on appeal. (*People v. Jones* (2014) 223 Cal.App.4th 995, 1001 [failure to request "pinpoint" instruction that subjective provocation would reduce murder from first to second degree forfeited on appeal because not raised in trial court].)

28

2. CALJIC No. 8.20

Defendants claim the trial court had a sua sponte duty to give CALJIC No. 8.20 (Deliberate and Premeditated Murder), because it states: "If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection *and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree*." (Italics added.) Defendants argue the italicized language would have "expressly told the jury it should consider subjective heat of passion in deciding whether the prosecution had proved the deliberation and premeditation elements . . . ."

CALCRIM No. 521, the successor instruction to CALJIC No. 8.21, covered the same point made in CALJIC No. 8.21 by instructing that: "A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated." If defendants wanted an additional instruction on "subjective heat of passion" or how "subjective heat of passion" could negate the elements of premeditation and deliberation, and reduce what would otherwise be a first degree murder to second degree murder, they should have requested it, but they did not. (*People v. Hart* (1999) 20 Cal.4th 546, 622 [failure to request clarifying instruction at trial forfeits claim on appeal]; see also *People v. Lang* (1989) 49 Cal.3d 991, 1024 ["A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language."].)

29

### 3. CALJIC No. 8.30

In its latest edition published in 2005, CALJIC No. 8.30 provided: "Murder of the second degree is [also] the unlawful killing of a human being with malice aforethought when the perpetrator intended unlawfully to kill a human being but the evidence is insufficient to prove deliberation and premeditation."

In *Rogers*, it was error not to give CALJIC No. 8.30 sua sponte. (*Rogers, supra,* 39 Cal.4th at p. 866.) The court observed that "the trial court erred by omitting an instruction that second degree murder includes an intentional but unpremeditated murder," namely, CALJIC No. 8.30. (*Rogers, supra,* at p. 866.) More specifically, the trial court erred because "it failed to explain that a murder committed with express malice could constitute second degree murder," and "[t]he omission of CALJIC No. 8.30 created an obvious gap in the instructions that was not filled by any of the other [given] instructions . . . ." (*Id*. at p. 867.)

Here, however, CALCRIM No. 521 replaced CALJIC No. 8.30 and filled the gap in the instructions left in *Rogers.* CALCRIM Nos. 520 and 521 instructed, *by clear and necessary implication*, that second degree murder includes an unpremeditated, intentional murder, and that a murder committed *willfully* or with express malice (i.e., with intent to kill), but without premeditation or deliberation, is second degree murder.

Indeed, CALCRIM No. 520 instructed that a defendant acted with express malice if he or she unlawfully intended to kill, and CALCRIM No. 521 instructed that a defendant acts "willfully" if he or she intended to kill. CALCRIM No. 521 further

30

instructed that each defendant was guilty of first degree murder "if the People have proved he or she acted willfully, deliberately, *and* with premeditation" (italics added), and explained that intent to kill *alone* is insufficient to prove deliberation and premeditation: "A defendant acted willfully if he or she intended to kill. A defendant acted deliberately if he or she carefully weighed the considerations for and against his or her choice and, knowing the consequences, decided to kill. A defendant acted with premeditation if he or she decided to kill before completing the acts that caused death."

CALCRIM No. 521 concluded: "The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder." CALCRIM No. 520 further instructed: "If you decide that a defendant committed murder, you must then decide whether it is murder of the first or second degree."

Based on CALCRIM Nos. 520 and 521, the jury must have understood that each defendant was guilty of second degree murder, not first degree murder, if it found that defendant acted willfully *or* with express malice—that is, with intent to kill—but did not act with deliberation or premeditation.

4. <u>CALJIC No. 8.71</u>

Ayon, joined by Vega without additional argument, complains the instructions "were also deficient in that they did not include the general principle of law contained in CALJIC No. 8.71, which reads: "If you are convinced beyond a reasonable doubt and

31

unanimously agree that the crime of murder has been committed by a defendant, but you unanimously agree that you have a reasonable doubt whether the murder was of the first or of the second degree, you must give defendant the benefit of that doubt and return a verdict fixing the murder as of the second degree [as well as a verdict of not guilty of murder in the first degree]."

CALJIC No. 8.71 is based on "the *Dewberry* principle" which, in keeping with section 1097, requires the court to instruct the jury that when the evidence is sufficient to support a finding that the defendant committed both the offense charged and a lesser included offense, the jury must find the defendant guilty only of the lesser offense. (*People v. Dewberry* (1959) 51 Cal.2d 548, 555-557.)[4]

CALCRIM No. 640, given here, is likewise based on section 1097 and the *Dewberry* principle. It instructed, in part: "If all of you agree that a defendant is not guilty of first degree murder but also agree that a defendant is guilty of second degree murder, complete and sign the form for not guilty of first degree murder and the form for guilty of second degree murder. Do not complete or sign any other verdict forms for that defendant for that count."

Neither Ayon nor Vega has explained why CALCRIM No. 640 was an inadequate substitute for CALJIC No. 8.71, or that CALCRIM No. 640 did not adequately instruct

---

[4] Section 1097 states: "When it appears that the defendant has committed a public offense . . . and there is reasonable ground of doubt in which of two or more degrees of the crime . . . he is guilty, he can be convicted of the lowest of such degrees only."

the jury in accordance with section 1097 and the *Dewberry* principle. Nor did either defendant object to CALCRIM No. 640 in the trial court, on any ground. Thus, defendants have forfeited any claim on appeal that CALCRIM No. 640 was deficient, or failed to adequately express the *Dewberry* principle. (*People v. Hart, supra,* 20 Cal.4th at p. 622 [failure to request clarifying instruction at trial forfeits claim on appeal].)

F. *The Parole Revocation Restitution Fines (§ 1202.45) Are Stricken*

Lastly, Vega, joined by Ayon without additional argument, claims the trial court erroneously imposed a $10,000 parole revocation restitution fine (§ 1202.45) on each of them, but suspended the fines pending their successful completion of parole. They claim the fines must be stricken because they were each sentenced to life without the possibility of parole; they are therefore ineligible for parole; and the fines constitute unauthorized sentences.

The People agree the fines must be stricken because defendants are ineligible for parole. (*People v. Battle* (2011) 198 Cal.App.4th 50, 63 [parole revocation restitution fines improperly imposed where sentence included life without the possibility of parole *and no determine terms*].)

We agree the fines must be stricken, but not because they were unauthorized by law and erroneously imposed. To the contrary, the fines were *not* imposed, and must be stricken because they were not imposed. In orally pronouncing sentence, the court said it was imposing a $10,000 *restitution fine* on each defendant (§ 1202.4) but was *not* imposing the related and concomitant parole revocation restitution fines on either

33

defendant (§ 1202.45). Still, the sentencing minute orders and abstracts of judgment for each defendant erroneously state that a $10,000 suspended parole revocation restitution fine (§ 1202.45) was imposed on each defendant.

It has long been settled that the oral pronouncement of judgment controls over any errors in the court's minute orders and abstracts of judgment. (*People v. Mesa* (1975) 14 Cal.3d 466, 471.) Additionally, this court has inherent authority to correct clerical errors in court records. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.) We therefore strike the parole revocation fines from defendants' sentences, and remand the matter with directions to prepare supplemental sentencing orders and amended abstracts of judgment for each defendant reflecting these corrections.

## IV.  DISPOSITION

The matter is remanded with directions to prepare supplemental sentencing minute orders showing that no parole revocation restitution fines (§ 1202.45) were imposed on defendant Ernesto Garcia-Vega or defendant Maria Manuelita Ayon, and to prepare amended abstracts of judgment, also showing that no parole revocation restitution fines were imposed. Copies of the amended abstracts are to be forwarded to the Department of Corrections and Rehabilitation. The judgments are affirmed in all other respects.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING _____

J.

We concur:

34

RAMIREZ
       P. J.

RICHLI
       J.